STATE of Missouri, Respondent,

v.

Kelly Robert SIMINO, Appellant.

No. SD 31829.

Missouri Court of Appeals,
Southern District,
Division One.

April 5, 2013.

fined to that issue.

Emmett D. Queener, Columbia, MO, for Appellant.

Chris Koster, Attorney General and Timothy A. Blackwell, Assistant Attorney General, Jefferson City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

A jury convicted Kelly Robert Simino ("Simino") of second-degree murder in the death of his girlfriend, Brandi Mathews ("Mathews"). Simino was sentenced to twenty years in the Missouri Department of Corrections ("DOC") to run consecutive with any other sentences he was serving. This appeal followed. We affirm the trial court's judgment.

**Factual and Procedural History**

On January 5, 2011, the State filed a "Complaint and Request for a Warrant" ("Complaint") in the Circuit Court of Miller County, Associate Division, against Simino charging him with second-degree murder, in violation of section 565.021,[1] for the death of Mathews. The Complaint alleged that Simino caused Mathews' death by "inflicting trauma upon her and striking her and choking her." On January 6, 2011, Simino was arrested.

On February 22, 2011, Simino filed a handwritten *pro se* "Request Motion for

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

Fast and Speedy Trial and Change of Venue."

On April 11, 2011, the case was transferred to the Circuit Court of Miller County and the next day, attorney Keith Halcomb filed an "Entry of Appearance" on behalf of Simino. On April 21, 2011, an "Information" was filed, which repeated those allegations set out in the Complaint, and gave notice that the State would also submit murder in the second degree based on the death of Mathews as the result of the perpetration of the felony of domestic assault.

On May 4, 2011, Simino filed an "Application for Change of Venue" and the case was transferred to Laclede County on the same day.

On May 17, 2011, a judge was assigned in Laclede County, a pre-trial conference was scheduled for June 6, 2011, and a jury trial for June 27, 2011. On May 19, 2011, Simino filed for a change of judge.

Neither party appeared for the pre-trial conference on June 6, 2011, and the case was passed. On June 27, 2011, the request for change of judge was sustained, and a case review was scheduled for July 8, 2011. At the case review, a jury trial was set for August 8, 2011. The State did not attend the case review due to lack of notice and, therefore, was not present to advise the trial court of any conflicts with the August trial date.

After learning of the trial setting, the State began "the process of witness notification" and learned that Dr. Carl C. Stacy, M.D. ("Dr. Stacy"), the Chief Medical Examiner, was going to be out of the country and unavailable for trial on August 8, 2011. As a result, on July 25, 2011, the State filed a "Motion for Continuance" because Dr. Stacy was a necessary witness on the issues of victim remains identification, evidence of injury or damage to the body, and the cause and manner of death. Simino's counsel objected to the continuance because Simino had filed a speedy-trial request, and the State could have made arrangements for Dr. Stacy to be available. The State argued Simino's rightful request for change of venue and change of judge caused some delay in this case, Dr. Stacy's trip had been scheduled for over a year, he was a necessary witness, and Simino would not be prejudiced because he was already incarcerated in the DOC on unrelated charges. The trial court found that the State's witness was necessary to its case, that Simino would not be prejudiced by a continuance, and granted the State's motion. The trial court reset the case for jury trial on October 24, 2011.

At the pre-trial conference on September 8, 2011, Simino filed a "Motion to Dismiss."[2] The motion was "heard and argued" and then denied by the trial court. On September 9, 2011, Simino also filed a "Motion to Dismiss with Prejudice for Lack of Jurisdiction."

On October 11, 2011, at the pre-trial conference, the State filed a "Request for Leave to Endorse Additional Witnesses."[3]

---

**2.** Simino's "Motion to Dismiss" was not filed as a part of the record. Because it was not filed, this Court cannot ascertain whether it is in fact the "Motion to Dismiss" filed by Simino for violation of his right to a speedy trial which was overruled by the trial court, and which he asserts as error in his Point I. "It is the duty of an appellant to ensure 'the record on appeal includes all the evidence and proceedings necessary for determination of the questions presented.'" *State v. Brumm,* 163 S.W.3d 51, 56 (Mo.App. S.D.2005) (quoting *State v. Sumowski,* 794 S.W.2d 643, 646 (Mo. banc 1990)); *see* Rule 30.04(a). This motion, as well as any other motions, exhibits or documents not filed with this Court, will be inferred as favorable to the trial court's ruling and unfavorable to Simino's argument. *Id.*

**3.** The State's "Request for Leave to Endorse Additional Witnesses" was also not filed as a part of the record.

Simino's counsel had no objection and the court sustained the motion. The following colloquy took place:

THE COURT: The State has filed today a second motion in limine as to several subjects as well as request for leave to endorse additional witnesses. Let's take up the request for leave to endorse additional witnesses. Any objection, [Simino's Counsel]?

[SIMINO'S COUNSEL]: No, Your Honor.

THE COURT: That motion is sustained.

The five-day jury trial was reset for October 24, 2011. On the morning of trial, prior to voir dire of the jury panel, Simino's counsel renewed his request for the court "to dismiss this cause based on the State's failure to prosecute outside of the 180–day time frame[.]" The trial court heard argument and overruled this motion. Simino's counsel then renewed the request for dismissal based on lack of jurisdiction, which was also overruled by the trial court.

On October 31, 2011, the last day of trial, the State filed a "First Amended Information" alleging the same acts and crimes, but with the additional language: "by inflicting trauma upon her and striking her and choking her *and by means unknown, and the body of Brandi Mathews was found in the County of Miller, State of Missouri....*" (Emphasis added). The First Amended Information listed new witnesses the State intended to call in addition to those listed on the Information filed on April 21, 2011.[4]

Simino was convicted based on circumstantial evidence. However, Simino does not challenge the sufficiency of the evidence to support his conviction. Therefore, we set forth only those facts from the trial necessary to address Simino's points. In doing so, we view the evidence in the light most favorable to the verdict. *State v. Newberry,* 157 S.W.3d 387, 390 (Mo.App. S.D.2005).

The evidence presented at trial showed that Simino and Mathews had a long-standing, tumultuous relationship beginning in the summer of 2004. Over the years, Simino and Mathews lived together, separated numerous times, and Mathews would return to Arkansas to live with her mother. Mathews' mother recounted numerous incidents where Simino would call looking for Mathews and when Mathews would not speak to, or agree to return to him, Simino would make threats to destroy Mathews' personal property and kill her dog.[5]

On two occurrences at motels, one in North Carolina, and one in Warrensburg, Missouri, the police were called and incident reports made. In North Carolina, Simino allegedly told Mathews, "I'm going to kill you and you're lucky that I don't beat your ass and leave you in this room." When Mathews tried to leave, Simino hit her wrist, leaving a red mark.

The incident in Warrensburg began when Simino tried to engage in an argument with Mathews at her place of employment ("the club"), which resulted in Simino being told to leave the club by the manager. Simino later called the club and when the manager refused to let him speak to Mathews, Simino made threats to kill Mathews if she did not come with him.

---

4. However, it is unclear if these additional witnesses were listed in the State's Request to Endorse Additional Witnesses because as stated, that request was not made part of the legal file.

5. At one point, Mathews' mother said there were calls like this at least once a day.

Because of Simino's threats, the manager made arrangements for Mathews to get a room at a nearby motel because she was living with Simino at the time. He also called the sheriff's department regarding Simino's threats. A deputy was dispatched to the motel and while there, Simino called the motel and the clerk gave the phone to the deputy. Simino told the deputy to put the call through to Mathews' room and when the deputy refused, Simino made threats to burn baby pictures of Mathews' child and said he had already burned her clothes. Later, a window on Mathews' car was found broken.

In early August 2006, Mathews and Simino were once again together when Mathews contacted the Eldon police department with information that she and Simino "would be coming into town at the local McDonald's around six o'clock with some cocaine." Mathews asked that her name not be revealed because she was afraid Simino would kill her. The responding officer arrested Simino pursuant to an outstanding warrant on a traffic ticket and during that arrest, the officer found three small baggies of cocaine on Simino's person. After this incident, Mathews returned to her mother's home in Arkansas. Later, Simino called Mathews at her mother's home and said, "You F-ing bitch, you turned me in and set me up ... and I'm going to kill you."

On August 16, 2006, Mathews filed an "Adult Abuse/Stalking Petition for Order of Protection" ("abuse petition") against Simino. After being served in jail with the "Adult Abuse/Stalking Ex Parte Order of Protection" ("protection order"), Simino told a friend that "if he could get his hands on that bitch, he'd kill her." The petition stated:

> I was in an abusive relationship, I set him up w/ the [sic] police.... When he's released he will come after me.

. . . .

> Dec. 05—padlocked me in house because I was trying to leave head butted me and gave me a concussion, refrained [sic] me from calling emergency services.

> April 06 I tried to leave him in South Carolina. He chased me across North Carolina. found [sic] me tried to kidnap me and threatened to kill me. If it hadn't been for the lady at the desk I probably would have been dead. As he was escorting me out I screamed for help. He dragged me out the door and through the parking lot and finally let go.

> August 06—Refrained [sic] me from going outside, using the phone. Told me if the cops showed up he'd be done w/ me [sic] before they got him and then they could take him on assault then.

During trial, the State offered Exhibit 10, a certified copy of the protection order with Mathews' verified abuse petition attached. The "return copy" of the protection order was already admitted into evidence. Simino's counsel objected on "foundation issues" to the handwritten abuse petition stating there was no proof the abuse petition was authored by Mathews other than what appeared to be her signature. The trial court overruled the objection.

Thereafter, the couple reunited and lived in Warrensburg, Missouri, where Mathews started school. Mathews continued to have contact with her mother up through September 2006; however, late September 2006 was the last contact Mathews' mother had with Mathews.

Several friends testified to statements made to them by Simino regarding Mathews. Simino told one friend he had accidentally broken Mathews' neck, killed her, and hid her body. Simino told a second friend that "what had happened wasn't

meant to happen, it was an accident[ ]"; the authorities wanted him to come in and he thought the purpose was to question him about Mathews' disappearance; and he was worried because the evidence was pointing to him.

In the fall of 2008, when questioned by authorities, Simino told them Mathews might be in South Carolina, that he had ended the relationship because he was tired of it, and said Mathews left him in October 2006. He admitted there was some tension in the relationship because Mathews had set him up with drugs and got him arrested. He said it was Mathews' cocaine he had when he was arrested. Simino stated that the last contact he had with Mathews was a text message he received from her about a week later asking him to pick her up in Columbia, which he refused to do.

On January 3, 2009, a skull, later identified as that of Mathews, was found under a bridge near Eldon, Miller County, Missouri. The skull had numerous traumatic defects that had been inflicted with an instrument such as a shovel. The body had been decapitated. The medical examiner ruled that the death was a homicide.

In January 2009, after hearing about the discovery of the skull, Mark McDaniel ("McDaniel"), a local resident, testified he told authorities that in September 2006, as he was driving his vehicle on Salem Road near Highway 54 in Miller County, he observed a black Nissan truck parked at the end of the road. He saw a man who had a woman pushed back over the truck, screaming at her and choking her. McDaniel slowed down, the man looked at McDaniel and appeared angry and enraged, and the man then let the woman go. As the woman ran toward McDaniel's truck, the man grabbed her coat and ripped it from her. McDaniel drove on because he did not want to get involved in a domestic dispute. However, he turned around and went back and the man was still by the car, and the woman was standing on the side of the road crying. McDaniel turned around again and the people were in the same place as he passed by. McDaniel did not know Mathews or Simino at the time, but later learned their names from the news reports.

In 2010, while incarcerated, Simino had an altercation with another inmate and allegedly told him, "I'll kill you just like I killed her."

At the close of evidence, the trial court conducted a formal instruction conference on the record to review jury instructions. The trial court submitted the following instructions over Simino's objection that the instructions violated the "merger doctrine":

### Instruction No. 8

If you do not find the defendant guilty of murder in the second degree as submitted in Instruction No. 6,[6] you must

---

6.

### Instruction No. 6
If you find and believe from the evidence beyond a reasonable doubt:
First, that between September 14, 2006 and October 30, 2006 or thereafter, the defendant caused the death of Brandi Mathews, and
Second, that defendant knew or was aware that his conduct was causing or was practically certain to cause the death of Brandi Mathews,

and
Third, that the body of Brandi Mathews was found in the County of Miller, State of Missouri, then you will find the defendant guilty of murder in the second degree.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree under this instruction, but you must then consider

consider whether he is guilty of murder in the second degree under this instruction.

If you find and believe from the evidence beyond a reasonable doubt:

First, that defendant committed domestic assault in the second degree as submitted in Instruction No. 9, and

Second, that defendant caused the death of Brandi Mathews, and the body of Brandi Mathews was found in the County of Miller, State of Missouri, and

Third, that Brandi Mathews was killed as a result of the perpetration of that domestic assault in the second degree, then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

Instruction No. 9

If you find and believe from the evidence beyond a reasonable doubt:

First, that between September 14, 2006 and October 30, 2006, or thereafter, the defendant recklessly caused serious physical injury to Brandi Mathews by inflicting trauma upon her or by striking her or by choking her or by means unknown, and

Second, that Brandi Mathews and defendant were adults who had been in a continuing social relationship of a romantic or intimate nature,

then you will find the defendant has committed domestic assault in the second degree.

whether he is guilty of murder in the sec-

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you cannot find that the defendant has committed domestic assault in the second degree.

As used in this instruction, the term "recklessly" means the conscious disregard of a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

The jury found Simino guilty of second-degree murder. The jury recommended a sentence of twenty years, and the sentencing court agreed and sentenced Simino to twenty years in the DOC. This appeal followed.

Simino contends the trial court erred in: (1) overruling the motion to dismiss because he was deprived of his right to a speedy trial; (2) in submitting Instruction No. 8 (felony murder), and Instruction No. 9 (defining domestic assault), along with the conventional second-degree instruction (Instruction 6) because their submission was prohibited by the "merger doctrine"; and (3) overruling Simino's objection to and admitting State's Exhibit 10 (abuse petition).

The issues presented for our determination are:

1. Whether the trial court abused its discretion in denying Simino's motion to dismiss the charges against

ond degree under Instruction No. 8.

him because of a violation of his constitutional right to a speedy trial.

2. Whether the trial court erred in submitting both the conventional second-degree murder instruction and the alternative felony-murder instruction based on domestic assault.

3. Whether the trial court abused its discretion in admitting State's Exhibit 10, containing Mathews' abuse petition.

### Point I: No Abuse of Discretion in Denial of Motion to Dismiss

Simino claims in his first point that the trial court erred in overruling his motion to dismiss the charges against him. Simino asserts he was denied his right to a speedy trial because the delay provided the State the opportunity to secure six adverse witnesses at trial, which prejudiced Simino.

### Standard of Review

A trial court's ruling on a motion to dismiss is reviewed for abuse of discretion. *State v. Scott*, 348 S.W.3d 788, 794 (Mo.App. S.D.2011). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Kleine*, 330 S.W.3d 805, 808 (Mo.App. S.D.2011).

### Analysis

"A defendant's right to a speedy trial arises under the Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment." *State ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 910–11 (Mo. banc 2010) (footnote omitted). The speedy trial protections attach when there is a formal indictment or information, or an arrest and holding to answer a criminal charge. *Id.* at 911.

Analysis of Sixth Amendment speedy-trial claims is governed by *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). "Orderly expedition of a case, not mere speed, is the essential requirement behind a speedy trial." *State v. Greenlee*, 327 S.W.3d 602, 611 (Mo.App. E.D.2010). The speedy-trial analysis is a balancing process that involves weighing the following four factors: " 'length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *State v. Buchli*, 152 S.W.3d 289, 307 (Mo.App. W.D.2004) (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182).

Considering the first factor, Missouri courts have held that a delay of greater than eight months is presumptively prejudicial to a defendant. *Garcia*, 316 S.W.3d at 911. The length of delay is a "triggering mechanism" because until the delay is regarded as presumptively prejudicial, there is no reason to discuss the remaining three factors. *Id.* Any delays attributable to the defendant are subtracted when determining the length of the delay. *State v. Joos*, 966 S.W.2d 349, 352 (Mo.App. S.D.1998). Also, the actions of a defendant's attorney are attributed to the defendant in analyzing a speedy-trial claim. *State v. Scott*, 348 S.W.3d 788, 797 n. 5 (Mo.App. S.D.2011).

Both Simino and the State agree that the length of delay here is presumptively prejudicial. Simino was arrested on January 6, 2011, and was not brought to trial until October 24, 2011. Under *Garcia*, the delay in this case—nine and a half months—is presumptively prejudicial. As a result, we must evaluate the other three factors.

The second factor is the reason for the delay. If there is a delay in trial, it becomes incumbent upon the State to show reasons which justify a delay because the State carries the burden to afford the accused a speedy trial. *Greenlee*, 327 S.W.3d at 611–12. Different weights are assigned to different reasons for delay of a trial. *Garcia*, 316 S.W.3d at 911. Where a defendant has contributed to the delay by requesting and being granted continuances, he cannot later successfully allege the delay caused the denial of his right to a speedy trial. *Greenlee*, 327 S.W.3d at 612.

As to the second factor, we must review the chronology of events in this case:

January 5, 2011: State filed Complaint in the Circuit Court of Miller County, Associate Division.

January 6, 2011: Simino arrested.

February 22, 2011: Simino filed a handwritten *pro se* "Request Motion for Fast and Speedy Trial and Change of Venue."

April 11, 2011: Case transferred to the Circuit Court of Miller County.

April 12, 2011: Attorney Keith Halcomb filed an "Entry of Appearance" on behalf of Simino.

April 21, 2011: Information filed.

May 4, 2011: Simino filed an "Application for Change of Venue" and the case was transferred to Laclede County.

May 17, 2011: Judge assigned. Pretrial conference scheduled for June 6, 2011, and a jury trial scheduled for June 27, 2011.

May 19, 2011: Simino filed a "Motion for Change of Judge."

June 6, 2011: Pre-trial conference in Laclede County; neither party appeared, case passed.

June 27, 2011: Change of judge sustained, judge assigned. Case review scheduled for July 8, 2011.

July 8, 2011: Case review—case set for jury trial on August 8, 2011. State not in attendance due to lack of notice.

July 25, 2011: State filed "Motion for Continuance" because Dr. Stacy was a necessary witness on the issues of victim remains identification, evidence of injury or damage to the body, and the cause and manner of death. Motion granted and case reset for trial on October 24, 2011.

From the above timeline, we conclude that Simino did contribute to the delay of the trial of this case. "Where the defendant contributes to the delay by asking for and being granted a . . . change of venue, or a change of judge, those reasons for the delay are weighed heavily against him." *State v. Farris*, 877 S.W.2d 657, 660 (Mo.App. S.D.1994). On February 22, 2011, Simino filed a request for speedy trial, and trial was set for June 27, 2011, (after the case was transferred to Laclede County following Simino's Application for Change of Venue). Two days after the case was set for the June trial, Simino requested a change of judge. Once a new judge was assigned, a case review was set for July 8, 2011, during which the case was set for jury trial in August.

Although Simino's request for change of venue and change of judge appear to be valid and legal requests, these requests did contribute to the delay in this case. Plain and simple, Simino's requests created delay and removed the case from the June 27, 2011 trial setting, causing delay, which weighs against Simino.

Shortly after the case was set for trial in August, the State learned that Dr. Stacy was not available to testify at trial due to a trip that had been scheduled for over a year. Simino argues the State was not

justified in requesting a continuance because Dr. Stacy's testimony was unnecessary.[7] We disagree.

■ A delay due to an unavailable witness is a valid delay, is justified, and is not weighed against the State. *Farris*, 877 S.W.2d at 660. Dr. Stacy was a key witness who was to testify to the likely cause of death, the manner of death, the time when injuries occurred, and how long Mathews lived after receiving injuries.[8] In light of his testimony, the requested continuance was justified and is not weighed against the State. *Id.*

■ The third factor is whether the defendant asserted his right to a speedy trial. *Scott*, 348 S.W.3d at 797. This factor involves an examination of "how and when the defendant asserts his right to a speedy trial." *Id.* When a defendant asserts his right to a speedy trial later in the proceedings by filing a motion to dismiss rather than a motion for an immediate trial, "his actions will be read to 'indicate a desire to avoid trial rather than to have a speedy trial.'" *Id.* (quoting *State v. Nelson*, 719 S.W.2d 13, 19 (Mo.App. W.D. 1986)).

Simino was arrested on January 6, 2011, and filed a handwritten *pro se* motion for speedy trial on February 22, 2011. He timely asserted his right to a speedy trial. This factor weighs in favor of Simino.

■ The fourth factor, prejudice to the defendant, is considered to be the most important and serious factor. *Greenlee*, 327 S.W.3d at 612.

There are three considerations in determining whether a delay has prejudiced the defendant: (1) prevention of oppressive pre-trial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired. These three factors represent the interests of a defendant that the right to a speedy trial is intended to protect.

Of these three considerations in determining prejudice, courts regard the third, the possible impairment of the defense, as the most serious and important. *Garcia*, 316 S.W.3d at 912 (internal citations omitted). "Claims of prejudice must be actual or apparent on the record or by reasonable inference[,]" while speculative or possible prejudice is not enough. *State v. Drudge*, 296 S.W.3d 37, 43 (Mo.App. E.D.2009). A defendant's failure to present evidence of actual prejudice weighs in the State's favor. *Id.* The deprivation of the right to a speedy trial is not considered per se prejudicial. *State v. Bell*, 66 S.W.3d 157, 164 (Mo.App. S.D.2001).

■ The fourth and most important factor also weighs against Simino because he fails to meet his burden to show actual prejudice due to the delay in his trial. Here, Simino asserts he was prejudiced because the delay in trial resulted in additional witnesses for the State. The most important factor this Court must consider to determine whether Simino suffered prejudice is the possible impairment to his defense. *Garcia*, 316 S.W.3d at 912. "Impairment to the defense may occur where defense witnesses become unavailable or 'are unable to recall accurately events of the distant past.'" *Scott*, 348 S.W.3d at 797 (quoting *Garcia*, 316 S.W.3d. at 912). Simino claims no "impairment" to his defense, but rather claims the delay resulted in availability of additional witnesses for

---

7. Simino does not allege, and there is no indication in the record, that any part of the delay by the State was intended to hamper Simino's defense.

8. We note that the trial court also found that Dr. Stacy was a necessary witness to the State's case.

the State's case. Simino has not alleged that witnesses disappeared, evidence was lost, or witnesses were unable to recall events due to the two-and-a-half-month delay in trial. He has failed to present evidence of prejudice by showing his defense was impaired, so this factor is weighed heavily in the State's favor and against Simino. *See Drudge*, 296 S.W.3d at 43.

In addition, we question whether Simino has any argument that the testimony from the State's additional witnesses resulted in prejudice to him. In support of his position, Simino points out that the Information filed on April 21, 2011, listed fifteen witnesses, while the Amended Information filed on October 31, 2011, listed twenty-four additional witnesses. Out of those additional witnesses, six testified at trial. He claims the six witnesses' testimony "only became available to the State because it secured a continuance from the August, 8, 2011, trial setting" and their testimony "influenc[ed] the jurors toward a verdict of guilt."

However, in his argument, Simino avoids an important fact in the sequence of events. Prior to trial, the State filed a Request to Endorse Additional Witnesses. At the pre-trial conference on October 11, 2011, the trial court specifically asked if he had an objection to the State's request for additional witnesses, and Simino's counsel responded, *"No, Your Honor* [,]*"* and the request was then sustained by the trial court. (Emphasis added). The actions of a defendant's attorney are attributed to the defendant in analyzing a speedy-trial claim. *Scott*, 348 S.W.3d at 797 n. 5. Here, Simino's attorney did not object to the endorsement of additional witnesses. He cannot now successfully allege that testimony from these additional witnesses is

evidence of prejudice to him. *See State v. Campbell*, 612 S.W.2d 371, 374 (Mo.App. E.D.1980) (holding that where a defendant contributed to the delay by requesting and being granted continuances, he cannot later successfully allege the delay caused the denial of his right to a speedy trial).

Simino does not allege, and there is no indication in the record, that his incarceration from the August 8 trial setting until the October 24 trial was oppressive or resulted in specific instances that weighed heavily on Simino and caused inordinate anxiety and concern.

■■■ This is not a case of excessive delay in a trial. After considering the factors and the facts and circumstances of the case, we cannot say the trial court's denial of Simino's motion to dismiss was clearly against the logic of the circumstances before the court or so arbitrary and unreasonable as to shock the sense of justice or indicate a lack of careful consideration. Therefore, the trial court's denial was not an abuse of discretion. Simino's Point I is denied.

### Point II: No Error in Giving Instructions No. 8 and No. 9

In his second point, Simino raises the "merger doctrine" as grounds for arguing the trial court erred in submitting a conventional second-degree murder instruction (Instruction 6) and the alternative felony-murder instruction (Instruction 8) based on domestic assault.[9] The "merger doctrine" is a judicially created " 'means of limiting or barring application of the felony-murder rule' when the act causing the homicide is indivisible from the act providing the basis for the underlying felony."

---

9. Instruction 8 requires the jury to find that Simino committed domestic assault in the

second degree as submitted in Instruction 9.

*State v. Williams,* 24 S.W.3d 101, 109 (Mo. App. W.D.2000) (quoting *State v. Coody,* 867 S.W.2d 661, 664 n. 1 (Mo.App. S.D. 1993)).

## Standard of Review

 A claim of instructional error is reviewed by this Court *de novo,* and the evidence is viewed in the light most favorable to the party submitting the instruction. *State v. Richie,* 376 S.W.3d 58, 64 (Mo.App. E.D.2012). "Reversal for instructional error is appropriate when the instruction misdirected, misled, or confused the jury and resulted in prejudice." *Edgerton v. Morrison,* 280 S.W.3d 62, 66 (Mo. banc 2009). "For prejudice to be found sufficient to reverse for instructional error, the error must have materially affected the merits and outcome of the case." *Richie,* 376 S.W.3d at 65 (citing *Rice v. Bol,* 116 S.W.3d 599, 606 (Mo.App. W.D. 2003)).

## Analysis

The elements of murder in the second degree are found in section 565.021.1 as follows:

1. A person commits the crime of murder in the second degree if he:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

(2) Commits or attempts to commit *any felony,* and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony,

another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

§ 565.021.1 (emphasis added)

Here, the State submitted Instruction 6, based on section 565.021.1(1) (conventional second-degree murder), and Instructions 8 and 9, based on section 565.021.1(2) (felony murder based on domestic assault). Simino argues that Instruction 8 (and 9) violated the "merger doctrine" because "the act causing the homicide was indivisible from the act providing the basis of the underlying felony-the domestic assault." His argument ignores "modern precedent [which] suggests that the merger doctrine has been abrogated." *State v. Gray,* 347 S.W.3d 490, 508 (Mo.App. E.D.2011). In *Williams,* the Western District reviewed the cases involving the "merger doctrine," the felony-murder rule, and statutory history. 24 S.W.3d at 109–17. The Western District concluded that the legislature intended "no other limitations be placed on the offense of felony murder, which would include limitation by way of the merger doctrine." *Id.* at 117 (noting the legislature excluded murder and manslaughter as predicate felonies for felony murder and in specifically doing so, meant for those exclusions to be the only limitations on the felony-murder offense). If the legislature had intended to include the merger doctrine as a limitation on the felony-murder rule, it could have easily done so. *Id.* (citing *Rodriguez v. State,* 953 S.W.2d 342 (Tex.Ct.App.1997)).[10]

10. The *Williams* court reviewed *Rodriguez,* 953 S.W.2d at 342, and the relevant Texas felony-murder statute. The *Williams* court applied the same statutory construction as the *Rodriguez* court to the Missouri felony-murder statute because such a statutory construction has been recognized by Missouri courts. *Williams,* 24 S.W.3d at 117 (citing *City of Springfield ex rel. Board of Pub. Utilities v. Brechbuhler,* 895 S.W.2d 583, 585 (Mo. banc 1995); *State ex rel. Birk v. City of Jackson,* 907 S.W.2d 181, 185 (Mo.App. E.D.1995)).

■ The express language of the felony-murder statute abrogated the common law doctrine of merger, and we "are obligated to enforce the felony-murder statute as written, without limiting its application by the [merger] doctrine." *Williams*, 24 S.W.3d at 117. Thus, the trial court did not err in submitting Instructions 8 and 9.

■■ Simino also argues submission of conventional second-degree murder, along with the alternative felony-murder instruction, "infected the entire trial." We note that submission of a conventional second-degree murder instruction along with an alternative felony-murder instruction is permissible. "While it is not a lesser degree offense of murder in the second degree—conventional, murder in the second degree—felony can be submitted as an alternative means of finding second[-]degree murder." MAI–CR3d 314.06, Notes on Use 7 (citing § 565.021.3).[11]

We conclude the trial court did not commit error in submitting both the conventional second-degree murder instruction and the alternative felony-murder instruction based on domestic assault. Simino's Point II is denied.

### Point III: No Abuse of Discretion in Admitting Exhibit 10

Simino claims in his third point that the trial court abused its discretion in admitting, over his objection, State's Exhibit 10. State's Exhibit 10 is a certified copy of the protection order with Mathews' abuse petition attached. This exhibit was offered as a certified court record.[12] The "return copy" of the order was already admitted into evidence. Simino contends the trial court erred in admitting Exhibit 10, specif-

ically the petition, into evidence "on foundation issues" because there was no evidence that the writing and content in the abuse petition had been written by Mathews.

### Standard of Review

■ "The trial court has broad discretion to exclude or admit evidence at trial." *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997). "This Court will reverse only upon a showing of a clear abuse of discretion." *Id.* "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Kleine*, 330 S.W.3d at 808. On direct appeal, we review "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Forrest*, 183 S.W.3d 218, 223–24 (Mo. banc 2006) (internal quotation and citation omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 224.

### Analysis

The foundation required for admission of certified court records is set out plainly in section 490.130:

Copies from the record of proceedings of any court of this state, attested by the clerk thereof, with the seal of the court annexed, if there be a seal, or if there be no seal, with the private seal of the clerk, shall be received as evidence of

11. Assuming *arguendo* that it was error to submit the felony-murder instruction, we see no prejudice to Simino because he was not found guilty under the felony-murder instruction.

12. Both the protection order and abuse petition were certified by the Pettis County Circuit Clerk.

the acts or proceedings of such court in any court of this state.

Simino does not challenge that Exhibit 10 was a certified court record. Rather, he argues that section 490.130 does not overcome his objection to Exhibit 10 due to lack of authentication that Mathews was the author of the statements in the abuse petition. However, he cites no relevant authority supporting this position.[13]

The Supreme Court of Missouri has held certified copies of court records were admissible under section 490.130 "without further identification." *State v. St. Clair*, 262 S.W.2d 25, 28 (Mo.1953). The record at issue in *St. Clair* was a certified copy of an order of the County Court of Jackson County adjudging the defendant to be insane, indigent and a proper person to be sent to the state hospital. *Id.* The trial court refused to admit the certified copy of the judgment because of the State's objection that the document was not "properly identified." The Supreme Court of Missouri found the trial court erred in refusing to admit the exhibit because the exhibit showed proper certification by the court clerk, with the seal of the court affixed, and by the "express provisions of Section 490.130 RSMo 1949 ... [the exhibit was] admissible in evidence ... without further identification." *Id.*

■ Section 490.130 is clear that copies of court records "attested by the clerk ... shall be received as evidence of the acts or proceedings of such court[.]" In this case, Simino's sole objection was to the foundation of Exhibit 10; however, the exhibit was properly authenticated by the clerk's certification and seal on the document. The trial court found Exhibit 10, including the abuse petition, to be a court record.[14] Therefore, the trial court's ruling admitting Exhibit 10 in evidence was not error or an abuse of discretion. *See State v. Jones*, 579 S.W.2d 670, (Mo.App. E.D.1979) (admitting circuit court records without foundation or qualification under the Business Records Act).

In addition, the admission of Exhibit 10 into evidence in no way prohibited Simino from questioning the authenticity of Exhibit 10 in closing argument to the jury. Whether the allegations contained in the abuse petition were authentic went to the weight the jury could give Exhibit 10.

The trial court did not abuse its discretion in admitting State's Exhibit 10, containing an abuse petition. Accordingly, Simino's Point III is denied.

The judgment of the trial court is affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., CONCUR.

---

13. Simino cites *State v. Cravens*, 132 S.W.3d 919, 929 (Mo.App. S.D.2004) and *State v. Mack*, 903 S.W.2d 623, 630 (Mo.App. W.D. 1995) in his argument. Both cases are distinguishable from this case and do not provide authority for Simino's position. *Cravens* did not involve admissibility of a certified document or certified court record under section 490.130; rather, it involved admissibility of an address book found in the victim's trailer. 132 S.W.3d at 929. *Mack* addresses admissibility of a driving record under section 302.312, which "has been interpreted to create an exception to the Best Evidence Rule only; the copies are still subject to the same foundation objections as the originals: authentication and hearsay." 903 S.W.2d at 630. Neither case address admissibility of certified records under section 490.130.

14. The trial court noted Exhibit 10 was no different from the Information that was previously admitted as an exhibit.